UNITED STATES of America,
Plaintiff,

v.

FALLBROOK PUBLIC UTILITY DIS-
TRICT, etc., et al., Defendants.

No. 1247.

United States District Court
S. D. California, S. D.

April 5, 1961.

J. Lee Rankin, Solicitor Gen., William H. Veeder, Washington, D. C., for the United States.

Stanley Mosk, Atty. Gen., of the State of California, and F. G. Girard, Deputy Atty. Gen., for State of California.

Franz R. Sachse and Sachse & Price, Fallbrook, Cal., for Fallbrook Public Utility Dist.

George Stahlman, Fallbrook, Cal., for Vail Company.

George C. Grover, Corona, Cal., for Wm. W. Cottle and Katherine C. Gibbon.

JAMES M. CARTER, District Judge.

This opinion concerns only one problem in a long and protracted water rights case, namely the effect of prior judgments in the earlier State case wherein the Rancho Santa Margarita, predecessor to the United States (hereafter the Rancho), and the Vail interests (hereafter Vail) were the principal parties.

This action was commenced January 25, 1951, by the United States of America to quiet to its rights to water from the Santa Margarita River and its tributaries. During the years 1941, 1942 and 1943, the United States acquired, either by condemnation or purchase, most of the Rancho Santa Margarita. This land is used principally by the United States as a military reservation and includes Camp Joseph H. Pendleton, a United States Naval Hospital, and a Naval Ammunition Depot. The military reservation has a total area of approximately 135,000 acres and includes considerable land which is without the drainage area of the Santa Margarita River.

The Santa Margarita River is a coastal stream which drains a watershed in San Diego and Riverside counties and flows through Camp Pendleton for approximately 21 miles and thereupon enters the ocean. The defendants in this suit include all upstream claimants to the right to the use of the waters of said River and number several thousand.

This litigation has been a lengthy one and there are several reported federal decisions concerning this case. See, United States v. Fallbrook Public Utility District, D.C., 165 F.Supp. 806, 812-813, for a history of this litigation.

The present trial in this case has consumed 134 trial days before this Court and numerous hearings before a Master

who was appointed by this Court to hear factual data concerning areas within the watershed of a relatively minor, although not unimportant, nature.

As the trial is still in process, it is, of course, premature for any consideration to be given as to the final judgment which will be entered in this matter. However, during the litigation in this case there has arisen a question as to the effect of judgments which were entered in 1930 and 1940 in a case then pending in the San Diego County Superior Court. These judgments concern basically, the two major water users on the Santa Margarita River.[1] One of these is the plaintiff, United States of America, who is the successor of the Rancho Santa Margarita, and the other is the defendant, Vail Company, successor to the Vail interests.

Briefly, the facts of that State litigation are as follows:

In 1923 the Rancho commenced an action against Vail to secure a declaration of its riparian rights to the waters of the Santa Margarita River and its tributaries. In 1930, after a lengthy trial, the Superior Court of San Diego county entered judgment. Vail appealed from that judgment and in 1938 certain portions of that judgment were reversed by the California Supreme Court and the case was remanded for a limited retrial, Rancho Santa Margarita v. Vail, 11 Cal. 2d 501, 81 P.2d 533.

Thereafter, in 1940, the Rancho and Vail agreed by stipulation to the entry of a judgment by the San Diego County Superior Court. This judgment in essence allocated to the respective riparians the Rancho two-thirds ($\frac{2}{3}$) and Vail one-third ($\frac{1}{3}$) of the *entire* waters of the Santa Margarita River and its tributaries. That judgment provided certain methods for the parties to follow to determine their respective allocations, provided for a minimum surface stream flow,

and insofar as the Rancho is concerned, provided that Rancho could use its two-thirds ($\frac{2}{3}$) of the waters of the river on any of its lands including lands *without* the Santa Margarita River watershed.

In its amended complaint in the present action, the United States pleaded that it is the successor in interest of the Rancho and that it owns all the rights to the use of the water provided to the Rancho by the *1940* judgment of the San Diego County Superior Court. The United States did not plead or rely on the 1930 judgment. As will be seen hereafter, the United States, during the trial of the present action, seeks to avoid the holdings and effects of the 1930 judgment, while claiming the benefits of the 1940 judgment.

In the answer filed by Vail, Vail admitted that the United States owns all the rights to the use of water allotted to the Rancho by the 1940 judgment. However, during the course of this litigation and after the introduction into evidence of considerable testimony and exhibits, Vail petitioned this court to file an amended supplemental answer, which in essence requested this court to set aside or enjoin the prior state court judgments. The United States did not object to the filing of this amended supplemental answer, but did oppose the relief requested, and contends that the 1940 judgment was res judicata.

Considerable evidence, both oral and documentary, has been received on this issue and in fact almost all of the evidence received in this case is related directly or indirectly to this issue. Both the United States and Vail have rested their case as to the evidence which will be introduced on this issue, and both parties have requested this Court to enter an interlocutory decree in regard to this issue prior to the final adjudication of this litigation, on its merits.

---

1. In addition to the two major water users, two other riparians (called interveners), Playtor and the Estate of Murray Schloss were parties to the State action. Their successors in interest are parties to the present action. However, from a practical standpoint, their riparian lands are of such a minimal nature as to not warrant specific consideration and discussion in this opinion.

I

## The 1930 and the 1940 Judgments Must Be Treated As One Judgment.

We first must determine the relationship and effect of the State judgments of 1930 and 1940.

■ A study of the (1) findings and judgment entered in 1930 in the Superior Court, (2) the decision on appeal, Rancho Santa Margarita v. Vail, 11 Cal. 2d 501, 81 P.2d 533, and (3) the stipulated judgment entered in 1940, compels the conclusion that the stipulated judgment is a part of, and must be read with the original judgment.

This is true for various reasons:

(a) The stipulated judgment, in referring to the 1930 judgment, recites that "findings of fact, conclusions of law having been signed by the court * * * and filed and judgment on said findings and conclusions having been signed and entered; defendants and each of them thereupon appealed from the judgment and each part thereof, but said intervenors did not appeal from such judgment; the Supreme Court of the said state of California upon said appeal, having reversed said judgment and directed a new trial upon certain issues designated in the opinion of the court * * * and said plaintiff and defendants having stipulated to the entry of the following judgment.

"Now Therefore, It Is Ordered, Adjudged and Decreed that * * *"

Thus, the recitals in the stipulated judgment clearly indicate it was entered to finally conclude the litigation and dispose of the remaining issues in the case.

(b) In the Vail case, supra, at page 561, 81 P.2d at page 565, the Supreme Court said:

"* * * a reversal of the judgment is necessary. However, the new trial need not be a protracted one. Appellants have not challenged many of the findings. There is no need for a new trial on those issues. It would appear that on the new trial it will be necessary:

"(1) To ascertain the extent of appellants' (Vail's) riparian and irrigable acreage as set forth in the body of this opinion;

"(2) To ascertain the extent of respondent's (Rancho's) riparian and irrigable acreage only insofar as it involves the table land, discussed in the body of this opinion, and

"(3) To ascertain whether an injunction should be granted under the · rules set forth in the body of this opinion, and if so, what its terms should be."

Thus, with the above exceptions, the 1930 judgment was affirmed.

It is apparent therefore, that the parties by the Stipulated Judgment of 1940, cut through directions (1) and (2) above by the provisions in the stipulated judgment that water might be used within or without the water shed; and cut through (3) above by the apportionment of water which obviated the consideration of the details of an injunction.

(c) The findings supporting the 1930 judgment defined the surface stream system of the Santa Margarita River and certain ground water bodies found to be part of that stream system. The 1940 judgment did not. The 1940 judgment contains only references to the "Temecula Santa Margarita River and its tributaries". As a judgment apportioning the surface and ground waters, it is meaningless unless the extent of those waters is defined. It therefore becomes mandatory to refer to the findings in the 1930 judgment which define the surface and ground waters of the stream system in order to give meaning to the words "Temecula Santa Margarita River and its tributaries" as used in the 1940 judgment.

(d) In addition to references to various of the Exhibits which were part of the record at the first trial, there is in the stipulated judgment of 1940 a further reference which indicates that the stipulated judgment must be construed with the findings and judgment of 1930. At page 15 of the stipulated judgment ap-

pears the provision prohibiting the defendants, during any irrigation season, from making surface diversions of the waters of the river "at the Bridge pumping plant, the Catarini pumping plant or the Tule pumping plant *referred to in the findings herein.*" There were *no findings* in connection with the stipulated judgment of 1940. The reference is necessarily to the findings supporting the 1930 judgment.

Thus the 1940 judgment cannot be considered as an isolated, separate document but is an integral part of the overall judicial determination which was made by the California courts in the Santa Margarita v. Vail, supra, litigation. The two judgments, read together, make a logical whole. The parts of the 1930 findings which were not overturned on appeal support the unreversed part of the 1930 judgment and support the 1940 judgment.

The Court can reach no other conclusion but that the stipulated judgment of 1940 and the 1930 judgment must be read as one unified judgment; that the 1940 judgment was grafted on to and became a part of the 1930 judgment.

## II

As Judgments Apportioning Waters Between Riparians They Are Subject to Modification on a Showing of Changed Conditions.

Considering the 1930 and 1940 judgments, together or separately, they were an allocation of waters amongst riparians.[2] The question then presented is whether an allocation to riparians under California law can ever be res judicata or is it by its very nature such an allocation as is subject to further change in the event of substantial changes in conditions. It should also be pointed out at

2. We consider later, the contention of the United States that the 1940 judgment is a contract.

3. On November 29, 1951, the stipulation was entered into between the United States and the State of California. It

this stage that pursuant to a written stipulation signed by the United States [3] the Court must apply California law in determining this question, and other questions concerning water law.

▇▇▇ Even in the absence of such a stipulation, clearly California law would apply, People of the State of California v. United States, 9 Cir., 1956, 235 F.2d 647, at page 653. Since the adoption of Section 3 of article XIV of the California Constitution, in 1928, there can be no question that the right of a riparian to the use of water is limited to reasonable and beneficial use, Peabody v. Vallejo, 2 Cal.2d 351, 374–375, 40 P.2d 486. This right is not dependent upon use and, of course, non-use cannot suspend it, Halfmoon Bay Land Company v. Cowell, 173 Cal. 543, 551, 160 P. 675. All riparian owners of a water course have a common right therein and share correlatively of the stream's surface and subsurface flow, Carlsbad Mutual Water Co. v. San Luis Rey, 78 Cal.App.2d 900, 911, 178 P.2d 844. In essence, a riparian has no right to an allocation of water solely because he is a riparian unless he can reasonably and beneficially use the water. However, if he cannot use the water, his right is not destroyed but still exists and if he subsequently satisfies the condition of reasonable and beneficial use imposed by article XIV of the California Constitution he is then in a legal position to assert the right and have water allocated to him.

▇▇▇▇ Conversely, if a riparian is by judgment allocated water for reasonable and beneficial use on riparian land and that reasonable and beneficial use is subsequently abandoned, he would no longer have a right to the use of that water but his basic riparian right would still exist. Further, if a judgment were to allocate water to a riparian to be used on his ri-

recites it is for "the benefit of all the parties to this cause." Paragraph IV reads,

"That the rights of the United States of America to the use of water herein are to be measured in accordance with the laws of the State of California." See 165 F.Supp. 806, 813–14, for full draft.

parian land and such land were severed from its riparian status, the judgment allocation would be immediately ineffectual for it would be based on a riparian right which because of such severance would be extinguished.

As the riparian right is a correlative one to be shared proportionately with all other riparians on the stream, it is axiomatic that any increase or decrease in the reasonable and beneficial use of water by other riparians might necessitate a change in an allocation of water amongst riparians. This would not be a question of changing the riparian right for the right is never extinguished as long as the land remains riparian. However, the privilege of using the water which is based on the right is controlled by the constitutional dictate of reasonable and beneficial use.

Aside from reasonable and beneficial use, methods of irrigation and farming could change substantially over a period of years which would make a judgment allocation to riparians obsolete. For example, at the time of the judgment allocation amongst riparians the Court might conclude that a particular type of irrigation for a particular crop entitled the riparian to a specified amount of water as his correlative share. However, if that riparian were to change entirely his method of irrigation or the crop grown, so that the water demand would be lessened, or for that matter increased, he might under many circumstances be subject to a change in the water allocation.

Thus, in essence under the basic doctrine of riparian rights as determined by California law, it is clear that a judgment allocating water amongst riparians cannot be res judicata but is subject to change or modification upon a showing of change in conditions. California cases are in accord with this conclusion.

In City of Los Angeles v. Baldwin, 1879, 53 Cal. 469, Los Angeles brought an action to quiet title to the waters of the Los Angeles River. The defendants set up as a defense that in a former ac-

tion between the parties they had been adjudged riparians and that their diversions of water were then held to be proper riparian uses. The factual situation *had not* changed since the former judgment. The trial court gave judgment to the defendants. In affirming, the Court stated, (at page 470):

"The conditions do not appear to be different now from what they then were. The diversion by the defendants is the same now as then, *and while these conditions continue unchanged* the judgment rendered in the former action operates as a bar between the parties here." (Emphasis added.)

In a separate concurring opinion this result was emphasized,

"In other words, where the parties claim merely as riparian proprietors, the proportions to which they may respectively be entitled may vary from time to time, in accordance with the facts existing at the respective times." (at pages 474–475).

Thus, in this 1879 decision of the California Supreme Court, it was recognized that a judgment allocating water among riparians was *final as long* as the facts upon which it was founded remained unchanged, but the judgment *was not res judicata* for a *change* in the facts from those that previously existed would allow a change in the water allocation from that formerly provided by the judgment.

In Temescal Water Co. v. Dept. Public Works, 1955, 44 Cal.2d 90, 280 P.2d 1, the court was considering the propriety of a permit issued by the state to a district to *appropriate* water. The petitioners argued that they were entitled to an *independent* judicial trial in the Superior Court, as distinguished from the nonjudicial administrative procedure provided by California law, on the question of whether unappropriated water was available. The petitioners argued that for "practical reasons" an independent judicial trial could determine once and for all, by considering *all* of the existing rights and the estimated supply, whether unappro-

priated water was available or would ever be available. This "practical" argument was rejected by the California Supreme Court on the basis that a judicial determination could not *finally* determine what by its very nature was a *fluctuating question*. As stated by the Court, (at page 106, 280 P.2d at page 11),

"A judicial determination as to existing appropriative and riparian rights rests upon then present uses which may be quite different at a later time, and a determination as to the future availability of water necessarily can be only an estimate."

In Pabst v. Finmand, 1922, 190 Cal. 124, 211 P. 11, the court considered an action to quiet title to the waters of a creek. There were both riparian and prescriptive rights asserted. In considering whether an upper riparian user had used riparian water so as to obtain a prescriptive right, the Court had occasion to discuss what *amount* of water a riparian is entitled to, as follows, (at page 129, 211 P. at page 13),

"A riparian owner is entitled to a reasonable amount of water for use on his riparian lands. *What is a reasonable amount varies with the circumstances of each particular case and also varies from year to year,* for the amount which might be reasonable in a season of plenty might be manifestly unreasonable in a season of drought. Nor is the question of reasonableness to be tested solely by the needs of the upper riparian proprietor. The rights of riparian proprietors are correlative and the 'reasonable' amount to which any one riparian owner is entitled is to be measured by comparison with the needs of the other riparian proprietors." (Emphasis added.)

If, as pointed out above, the amount of water which *can* be *judicially allocated* to a riparian " * * * rests upon then present uses which may be quite different at a later time * * *", Temescal Water Co. v. Dept. Public Works, supra [44 Cal.2d 90, 280 P.2d 11], or " * * * varies from year to year * * *".

Pabst v. Finmand, supra, it would seem obvious that any judicial determination, i. e., judgment, which allocates water amongst riparians could be modified or set aside *if and when* the conditions change.

Another case which clearly shows that a judgment allocating water to riparians is not res judicata is Wiggins v. Muscupiabe L. & W. Co., 1896, 113 Cal. 182, 45 P. 160, 32 L.R.A. 667. Insofar as pertaining to the instant question, the trial court in allocating water to riparians had based the allocation on irrigable acreage. The appellant contended the allocation should have been made on the basis of land cultivated. In holding the method of allocation used by the trial court to be correct, the court stated, (at page 195, 45 P. at page 164),

"The amount of irrigable land belonging to each party, rather than the amount of land already under cultivation, would be properly made a controlling element in adjusting their respective rights to the flow of the stream; *otherwise, a readjustment would be necessary whenever either party should cultivate a greater or less area.*" (Emphasis added.)

While irrigable acreage would not fluctuate to the degree that cultivated land would, it is obvious that what land was considered irrigable in 1896 (the date of the decision in the above case) might be more or less in 1960 or 1996. The Court recognized that constant "readjustment" would be necessary whenever cultivation increased or lessened if that standard had been followed. For that reason an allocation based on irrigable acreage was preferred. But by stating that *readjustment* would be necessary, the court in effect negates any conclusion that a judgment allocation of water could be res judicata, for if it were, there could *never* be readjustment, regardless of what standard was used in determining the proper allocation.

In McFarland v. Superior Court, 1924, 194 Cal. 407, 228 P. 1033, the petitioner had been held in contempt for violation of a prior judgment which allocated water.

One of his defenses was that a change in conditions had occurred since the prior judgment in that more water was now available and that he could, therefore, violate the prior judgment allocation. This contention was, of course, rejected by the Supreme Court on the basis that change in conditions was immaterial *in the contempt proceeding*. However, the Court pointed out that if conditions had changed there was a remedy to be relieved of the former judgment restriction, (at page 424, 228 P. at page 1039),

> "Moreover, petitioners would have recourse to an action at law to determine any relative rights that may have intervened subsequent to the granting of injunctive relief."

If the prior judgment were res judicata, no remedy would have existed to accomplish a modification resulting from subsequent intervening changes in condition.

Since the constitutional amendment, in actions concerning *water allocation* the California courts have supported the proposition that the trial court expressly keep continuing jurisdiction over the case so as to be in a position to *promptly* act on changes in conditions which would affect the former judgment. See Tulare Irr. Dist. v. Lindsay-Strathmore Dist., 1935, 3 Cal.2d 489, 525, 45 P.2d 972; Carlsbad Mutual Water Co. v. San Luis Rey Co., 1947, 78 Cal.App.2d 900, 912, 178 P.2d 844.

If such a judgment of allocation was res judicata, there would be no reason or need that the court maintain continuing jurisdiction for the purpose of expediting change or modification of it in the event of a change in conditions.[4]

---

4. Aside from the above-cited *cases*, there is *uniformity of opinion* by recognized water law authorities that a judgment allocating water amongst riparians *is not* res judicata.

"The decree of apportionment of water among riparian owners, then, is binding upon the parties so long as it remains in effect; the decree remains in effect so long as the conditions upon which it is based remain substantially unchanged; but the decree may be modified in a subsequent proceeding if the conditions have changed sufficiently to warrant a new or modified apportionment," Hutchins, The California Law of Water Rights, 1956, p. 225.

"It is obvious that what is a reasonable amount varies not only with the circumstances of each particular case but also varies from year to year, for the amount which might be reasonable in a season of plenty might be manifestly unreasonable in a season of drought. It follows that a judgment fixing proportions in which water may be taken is not necessarily conclusive in subsequent actions concerning the same water, since circumstances determining relative rights may be different," 23 California Jurisprudence, p. 1142.

Perhaps the leading water law authority, and one frequently cited by the California Supreme Court is Samuel C. Wiel. Mr. Wiel states as follows:

"The apportionment decreed in equity is not a severance of rights such as occurs in partition between tenants in common, but is an equitable expedient to enforce, under existing conditions, the unseverable right of each to a reasonable use of the riparian land. The apportionment is merely such as, '*under the circumstances and facts in this case*, would be a reasonable and equitable division of the water.'

"Consequently, not being a severance of right, but an expedient of remedy in each case, an apportionment made at one time is not necessarily conclusive at a later point of time, when the circumstances on which it is based have changed. The apportionment is decreed in equity to afford equality on the facts existing at the time; on the circumstances then existing. When the circumstances change so that the decree no longer represents equality and reasonable division, then a readjustment must be had under the new conditions. A system of correlative rights accepting as its ground principle the determination of what is reasonable in each case, cannot in its nature be a system of permanent fixedness, such as is the system of exclusive rights by appropriation. The apportionment is permanent only if the surrounding circumstances on which it was founded remained unchanged, so that the equality of the apportionment is not destroyed; and ceases to be permanent when a subsequent change of circumstances has destroyed the reasonableness of the adjustment. For example, an apportionment based on the quantity of water needed to irrigate certain crops where

■ We conclude that the judgments of 1930 and 1940, read together, are an apportionment or allocation of the rights to the use of riparian water and are therefore subject to modification on a showing of changed conditions.

### III

Unless We Construe the 1940 Judgment As One Allocating Water and Subject to Modification on Changed Conditions—Then the Judgment Would Be Void.

Unless we construe the 1940 judgment as one allocating water to riparians, as we have done above, then a serious question is presented as to whether the Superior Court of San Diego County had jurisdiction to enter the specific 1940 judgment. It is conceded that only four of the several thousand riparians on the river were parties to that adjudication. The United States concedes that other riparians who were not parties cannot be bound by that judgment, a concession which is patently correct.

However, despite such concession, the 1940 judgment specifically allocated 66⅔% of the natural flow of the waters of the Temecula-Santa Margarita River and all its tributaries to the Rancho, and the remaining 33⅓% of such natural flow of that river to Vail.[5] What was left? Clearly the Court had no juris-

diction to allocate *all the waters* when others not parties to the action had substantial rights thereto. Yet the express language of that judgment did exactly that.

The United States does not contend that this language in the 1940 judgment was entered as a result of mistake or that it does not reflect the true judgment of the trial court, or that it was a clerical error. The United States contends that this 1940 judgment can be sustained if it is construed as not to allocate to the parties the use of the waters of the Temecula-Santa Margarita River and all its tributaries in the specified percentages, but rather to construe it as allocating to the parties the stated percentages of whatever undetermined total right to those waters the parties are, under California law, legally entitled to.

■ This would be in effect an amendment by construction. Under California law a judicial, as distinguished from a clerical, error, cannot be corrected by amendment even if clearly erroneous, Lankton v. Superior Court, 1936, 5 Cal.2d 694, 696, 55 P.2d 1170, Stevens v. Superior Court, 1958, 160 Cal.App.2d 264, 270, 325 P.2d 204, and see cases cited in 29 Cal.Jur.2d, Judgments, Sec. 102, pp. 17–18.

This legally erroneous language cannot be attributed to clerical error but.

both parties grow the same kind, would work great injustice when one party changes to crops requiring much less water, while the other changes to crops needing more. To make them share in the same proportion as before would work great injustice to one, simply to permit waste by the other.

"There are many other changing conditions. The soil requires more water at one time than another; different crops require different quantities of water, and these requirements vary at different stages of growth; humidity of seasons varies, and with it vary both requirements and supply; one kind of soil or crop returns more water to the stream than others; the times of applying the water will be different under changed methods of cultivation; the area cultivated or owned may change; the flow of

streams constantly changes; new parties may be involved in a subsequent controversy whom the former apportionment had not considered because not parties to the former suit, and whom the former decree cannot bind. All these things may produce changes subsequent to an apportioning decree to such an extent that the substantive right of each contestant to the equal reasonable use of their respective lands is no longer secured by the decree. Thus equality must depend upon circumstances, and the adjustment must change when they change. An equalized distribution at one time may become very unequal at a later point of time," Wiel on Water Rights, Third Edition, p. 824, Sec. 752.

5. The small allocation of water to the two intervening riparian owners was to come out of the Rancho's two-thirds.

was in fact an erroneous decision. Since this was a stipulated judgment, the error was substantially induced by the parties themselves.

A motion in the Superior Court where the judgment was entered will not lie to accomplish an amendment to this judicial error in the 1940 judgment, Barlow v. City Council of City of Inglewood, 32 Cal.2d 688, 197 P.2d 721. Can this Court accomplish the same result under the guise of construing the plain language to say what in fact it does not state? In other words, can this Court construe the 1940 stipulated judgment as a pooling of the rights of the Rancho and Vail Co., and a division of those rights? We think not.

▮▮▮ To the extent that the Court in the 1940 judgment attempted to allocate the right to the use of the water of the river beyond that vested in the parties to that proceeding, it was without jurisdiction to do so and its judgment, if so construed, is void. Moreover, in such case, the void provisions of the 1940 judgment could not be isolated from the remainder of that judgment with the result that the remaining provisions are effectual, for those void provisions would have been the basic provisions of that judgment upon which the other provisions rested.

### IV

#### The Change in Conditions.

Having concluded that under California law, a judgment allocation of water amongst riparians is not res judicata but subject to modification upon the showing of a change in conditions, it must now be determined whether in this case there has been a change in conditions in the 20 years subsequent to the 1940 judgment of a sufficient degree to warrant this Court to conclude that the 1940 judgment is inequitable, inoperative or otherwise ineffectual. The evidence, most of which is uncontradicted, dictates that this question must be answered in the affirmative.

In 1940 when the judgment was entered, the land of Rancho Santa Margarita was used primarily as a cattle ranch. Following the acquisition of the Rancho's lands by the United States, there has been a considerable change insofar as land use and water demands are concerned. The use of the water by the United States on its military reservation is in essence a use synonymous with a municipal use.

Formerly it was necessary to maintain surface flows of a sufficient degree for the cattle to drink and also to have surface springs or stock watering reservoirs for cattle use. Under today's conditions because of the nature of the stream system itself, it would be impractical if not impossible for the United States to satisfy its water requirements from surface flows or springs or small stock reservoirs. The most satisfactory way that the United States can satisfy its water needs is to use the ground water basins within its reservation which are a part of the Santa Margarita River. This the United States has done. They have drilled wells and installed pumps to supply their military reservation needs. There can be no question that use of these ground waters by the United States to satisfy its water needs is not only the most economical method whereby such needs can be satisfied, but is the only practical method whereby the United States could acquire water from the river to meet its water requirements.

Thus we see that during the 20 year period following 1940 there has not only been a change in the type of land use but also a substantial change in the method of using the water of the river from that which previously existed.

Further, as a result of the pumping of the ground water basins within the military reservation to satisfy the United States water requirements, there has resulted a change in the factual situation at the Ysidoro Narrows from that which existed in 1940, which makes inoperative as a practical matter one of the basic provisions of the 1940 judgment.

The 1940 judgment provided that the allocation of the waters of the river to the Rancho and Vail would be determined basically by the amount of water in the

river as measured at Ysidoro Narrows or at Temecula Gorge. In other words, the Rancho would be entitled to use on its lands an amount of water equal to two-thirds (⅔) of the measured flow at Ysidoro Narrows or at Temecula Gorge, and Vail would be entitled to use on its land an amount of water equal to one-third (⅓) of that measured flow. Ysidoro Narrows is located at a point on the Santa Margarita River just upstream from the river's mouth and downstream from the ground water basins which are used by the United States to satisfy its water requirements. As a result of the pumping of those basins by the United States, water which flows through Camp Pendleton does not reach Ysidoro Narrows as it did in 1940 but instead recharges the ground water basins which have been used to satisfy the United States water needs.

Therefore, as a practical matter, and especially during the irrigation season, there is no surface flow at Ysidoro Narrows as was envisioned by the parties to the 1940 judgment. Thus, as a result of the change from a ranch use to essentially a domestic use with the necessary result of ground water use as contrasted to surface flow use, one of the basic provisions of the water allocation set forth in the 1940 judgment has been factually abrogated.

Another change in conditions from that which existed in 1940 is that since 1940 substantial numbers of riparian land owners have made riparian land productive by the use of water from the river. These land owners have rights which, of course, could not have been affected by the 1940 judgment for they were not parties to that litigation. However, their uses of water have had an effect on the Santa Margarita River which was not considered by the 1940 judgment, and in fact was totally disregarded by it.

For example, the 1940 judgment allocated the *entire* waters of the river to the Rancho and Vail who were only two of numerous riparians on the river. No consideration was given in that judgment as to the possibility of water uses by

other riparians. There can be no question that such uses by these and other riparians have now reached the stage where they substantially affect the river. In fact, the United States' principal expert witness, Fred Kunkel, testified that such uses in Murrieta Valley (one of the two major ground water basins upstream from the military reservation) have lowered the ground water table to such an extent that there has been a reverse gradient in the ground water movement and that ground water which formerly moved southerly and westerly toward Camp Pendleton at certain times now moves in essentially an opposite direction. While this witness did testify that this was probably a temporary result and that upon recharge of the ground waters in the Murrieta Basin the reverse gradient would be corrected, it is evident from this testimony alone that the uses of waters by others has substantially affected not only the amounts of water available to the United States and Vail, but also the very flow of the stream itself.

We do not here decide whether these uses by other riparians who were not considered in the 1940 judgment, are in any way improper or excessive. It would serve no useful purpose to set forth all of the testimony given in this case which shows the extensive increase in the use of the waters of the river by others who were not parties to the 1940 judgment. Suffice it to say that there has been voluminous evidence by land owners within the watershed who are riparians who testified that since 1940 they have increased their water use for beneficial purposes from that which existed in 1940.

Thus, as outlined above, the record clearly establishes in this case a substantial change in the conditions both as to land and water use from that which existed in 1940. It is the Court's opinion that these changes in conditions render inequitable and, in fact, inoperative, the water allocation provided in the 1940 judgment.

This conclusion has been impliedly recognized by both the United States and Vail for the uncontradicted evidence

establishes that since 1940 there have been various years where one or the other diverted water from the river substantially in excess of that provided by the allocation in the 1940 judgment.

## V

### The Contention of the United States that the Stipulated Judgment Is a Contract.

The United States contends that the 1940 stipulated judgment is in any event and in actuality a contract. It is conceded by all that the 1940 judgment was signed by the Court and entered pursuant to stipulation.

The position of the United States is that the Rancho and Vail *entered into* a contract giving Rancho the right to use 66⅔% of all the waters of the River and Vail 33½% of such waters; that the United States has succeeded to the interests of the Rancho; and that *as to Vail and the intervenors* the United States has a right by contract to use *66⅔% of all the waters to which Vail and the United States would be collectively entitled to;* but that as to all other defendants the ordinary rules as to the use of riparian waters would apply.

We note that in a prior appeal in the present case, People of the State of California v. United States, 9 Cir., 1956, 235 F.2d 647, at page 657, Judge Fee stated:

> "But this stipulated judgment between two litigants is contractual in character between the principles to the agreement and is not binding upon the Water District or the State. Thus the correlative rights between the Vail Estate and the government have been settled by agreement."

The statement was dicta. The question of whether the Stipulated Judgment was a contract had not been briefed or argued in the case before Judge Fee. We do not consider that the statement is binding on us in this decision.

We have examined the Consents to the Stipulated Judgment filed by the plaintiff and the defendants in the prior action (Ex. No. 217 in this action). If there existed a contract it arose from the agreement of the parties. What then did they agree to? The Consents filed show a resolution by the plaintiff Rancho, to the effect that their attorney "be and he is authorized hereby to consent to the filing and entry in said action" of the stipulated judgment. The Consent filed by Vails is entitled "Authorization for Entry of Stipulated Judgment" and provides that their attorneys "are hereby authorized and directed to consent to the making and entering of said stipulated judgment by said court in said action."

Thus, *the meeting of the minds or the agreement of the parties was limited to an agreement that the court make and enter a specified judgment.* The language is directed entirely to court action. There are no words or phrases which indicate that the parties were making an agreement between themselves in the language of the stipulated judgment. The Consents clearly indicate that the parties contemplated court action, to-wit, a judgment, and it is a reasonable inference and is inherent in the actions taken by the parties, that this judgment, to be made and entered by the Court, was in lieu of a new trial on the issues specified in the decision of the California Supreme Court.

The United States appears to contend that the stipulated judgment of 1940 was an agreement whereby the Rancho and Vail "pooled" their rights and then agreed to share them on a ⅔–⅓ ratio. Thus, the United States contends that a decree can be drawn in this case fixing the water rights of all entitled parties in the watershed and still give effect to this "pooling" agreement.

If the parties had desired to enter into a contract or such a "pooling" agreement as distinguished from securing a judicial determination, it would have been a simple matter for them to have done so. No court action would have been necessary. The only conclusion that can be drawn from the fact that they did not choose this latter course of action, but sought a judicial decree, is that in 1940 it was

the conclusion of all that an integrated, complete judicial determination of their respective rights to the waters of the river was desirable. They chose the method of a water right decree, and such a decree, insofar as it deals with use by riparians, is subject to modification on showing of changed conditions.

Moreover and contrary to the contentions of the United States, we cannot and do not interpret the stipulated judgment and the Consents filed with the State court as an agreement to "pool" their rights.[6] Instead as riparians, they were apportioning or allotting the entire water of the Temecula-Santa Margarita River between themselves as if (with the exception of two intervenors) no other riparian owners or riparian land existed in the water shed.

In considering the 1940 judgment, we should note that it is not and cannot be considered as an isolated document, but is only a part of the over-all judicial determination which was made by the California courts in the Rancho-Vail litigation. The majority of the issues decided in that litigation were made following an extensive trial on the merits lasting three years (444 trial days), and those isolated matters which were provided for by stipulation in the 1940 judgment could not have the effect of changing a judicial determination into a mere contract.

A further difficulty is presented. We have held that the two judgments of 1930 and 1940, must be read together. They become in substance, one judgment. If the 1940 stipulated judgment is a contract, does it incorporate the provisions of the *1930 judgment* as part of the contract? Does it incorporate the *findings* of the 1930 judgment as part of the contract? We find nothing to so indicate

and we cannot so find. Does the 1940 judgment as a contract, abrogate those portions of the 1930 findings and judgment which were not reversed on appeal and became final? There is nothing to so indicate and we cannot so find.

Either result would be an incongruous situation which by all means should be avoided. However, under California law a judgment entered into pursuant to stipulation is in all respects a judgment and has the same force and effect as a judgment entered following a trial on the merits.

Section 577 of the Code of Civil Procedure of California defines a judgment as the final judicial determination. The case of Schwartz v. California Claim Service, 1942, 52 Cal.App.2d 47, 125 P. 2d 883, affirms this statutory definition of a judgment, and the District Court of Appeals point out in that case that the judgment is the judicial determination but its origin may be in contract or quasi contract or on a liability imposed by statute. But the judgment is a judicial act.

In the case of Guaranty Liquidating Corporation v. Board of Supervisors, 1937, 22 Cal.App.2d 684, 71 P.2d 931, the Court states:

"The judgment of a court of competent jurisdiction entered upon a stipulation of the parties has the same effect as if the action had been tried on the merits." At page 686, 71 P.2d at page 932.

United States v. Swift & Co., 1932, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999, specifically considered the question. The opinion was written by Justice Cardozo. In considering the power of the court to set aside or to modify a decree which

---

6. The United States relies on Section Twelfth of the 1940 judgment which provides generally that Vail is entitled to divert and use one-half of the amount which the Rancho is entitled to divert and use. When this Section is read with the other parts of the judgment, we cannot and do not interpret it to mean that eternally the Rancho receives two-thirds of the whole which *Vail and the*

*Rancho* would receive under any equitable apportionment which took into account the rights of other water users.

We call attention also to the use of the words "apportioned" in Section Sixth; "allocating" in Section Seventh; "apportionments and allotments" in Section Eighth; "apportioning" in Section Ninth; and "allotted" in Section Tenth.

was entered pursuant to a stipulation of the parties, Justice Cardozo states 286 U.S. at page 114, 52 S.Ct. at page 462:

"We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions, though it was entered by consent. The power is conceded by the government, and is challenged by the intervenors only. We do not go into the question whether the intervention was so limited in scope and purpose as to withdraw this ground of challenge, if otherwise available. Standing to make the objection may be assumed, and the result will not be changed. Power to modify the decree was reserved by its very terms, and so from the beginning went hand in hand with its restraints. If the reservation had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as event may shape the need * * *."

The United States Supreme Court thus indicates that a judgment entered into by stipulation of the parties is not a contract, and that insofar as the court's power is concerned, the parties cannot by stipulation change the result, from that which would exist if the case were tried on the merits.

The United States cites only two *California* cases in support of its position that the stipulated judgment is to be treated as a contract between the parties. Both cases, Yarus v. Yarus, 1960, 178 Cal.App.2d 190, 3 Cal.Rptr. 50, and In re Ferrigno, 1937, 22 Cal.App.2d 472, 71 P.2d 329, deal with the interpretation of stipulated judgments. They do not hold that such judgments are contracts for purposes other than interpretation of ambiguities.

When a court determines that a judgment is to be treated as if it were a contract between two or more parties, it does so by analogy. It is not necessarily intended that there is in literal effect a contract, Becker v. Becker, 1950, 36 Cal. 2d 324, 328, 223 P.2d 479; 1 Freeman on Judgments, Ed., § 6, pp. 10–11. As a result, it is possible for a court to treat a stipulated judgment as a contract for one purpose but not for another.

Our question is whether stipulated agreements are contracts which cannot be modified by the court action.

■ Since these are questions of State law, it is there the Court must seek its answer. A review of State cases is of little help. As expressed above, a stipulated agreement is a contract for purposes of interpretation. Yarus v. Yarus, supra; In re Ferrigno, supra. A stipulation for child support contained in an interlocutory decree of divorce is a contract for purposes of enforcement, Becker v. Becker, supra. However, as a judgment for child support it would be subject to modification by court action. A child support agreement contained in a divorce decree is a contract enforcible against a decedent's estate, Taylor v. George, 1949, 34 Cal.2d 552, 212 P.2d 505. Judgments also are treated as contracts to the extent that neither their security (Jones v. Union Oil Co., 1933, 218 Cal. 775, 25 P.2d 5) nor enforcement (Scarborough v. Dugan, 1858, 10 Cal. 305) can be impaired by legislation. And a judgment is a contract for purposes of permitting it to be used as a counterclaim, Miller v. Murphy, 1921, 186 Cal. 344, 199 P. 525. Nowhere are the questions before the Court at this time specifically answered.

■ There are a number of cases, however, holding that judgments apportioning waters between riparians are subject to modification on a showing of changed conditions. See part II, supra. It is the opinion of this Court that such decisions make imperative the conclusion that judgments shall not be treated as contracts where questions of their continuing effect or modification are posed. Were we to hold otherwise, parties to litigation involving water rights could by private agreement, oust the courts of their traditional equitable powers to ad-

just their decrees in accordance with changed circumstances.

We do not doubt the power of this Court to exercise its continuing jurisdiction over water decrees though they are entered by consent. Nor do we believe the parties can, by giving each other a consideration, purchase from a court of equity a permanent allocation of riparian rights. See United States v. Swift & Co., (supra); System Federation No. 91, Railway Employees' Department, AFL-CIO v. Wright, 1961, 364 U.S. 642, 646, 81 S.Ct. 368, 5 L.Ed.2d 349.

■ Since these legal questions set forth above are all connected with the continued validity of the stipulated judgment and the legality of its modification, it is concluded that they must be answered by reference to the law of judgments, and not by analogy to the law of contracts.

## VI

#### If the 1940 Judgment Is a Contract, the United States Has Breached and Vail Has Rescinded.

■ Even if it be assumed that the 1940 judgment is not a judgment but a contract, the United States, under the facts existing in this case, has breached the contract and Vail has elected to treat such continuing breach as grounds for rescission.

The United States has commenced litigation and forced Vail to defend whatever rights Vail has to the use of the waters of the river. Certainly there can be no question that one of the principal reasons which motivated the parties to dispose of the litigation by the 1940 stipulated judgment following the limited reversal by the California Supreme Court was to avoid further expensive litigation. Beyond doubt this purpose, as far as Vail is concerned, has been thwarted, for by bringing this instant action the United States has forced Vail to defend the lawsuit which, to date, has consumed some 134 trial days before this Court, not taking into account the numerous hearings which have been held before this Court's appointed master.

In addition, the United States has pleaded against Vail in this case considerable rights to the use of waters beyond those provided for by the 1940 stipulated judgment. They have pleaded and offered proof as against all defendants including Vail, of not only riparian rights but also prescriptive and appropriative rights and even rights which they have designated by the term "paramount rights."[7] If these rights which are claimed by the United States were found to be valid by this Court, the claimed "paramount" rights above, would have given the United States first claim on all the waters of the stream and there would have remained in fact insufficient waters available in the watershed to satisfy even a small part of the rights of Vail and other riparian users.

In addition, the United States has offered considerable testimony directed to establishing a stream system substantially in excess to that which predicated

---

7. The word "paramount" appears in the complaint and amended complaint. Its use led to an early outcry by newspapers and water users in the water shed that the United States was claiming rights by reason of its sovereignty, i. e., by the fact that it *was the government*.

"Paramount" is a word of art in California water law. It does not refer to rights from sovereignty. Judge Yankwich in the first written opinion in the case, United States v. Fallbrook P. U. D., D.C.1951, 101 F.Supp. 298, at pages 302–303 pointed out that a paramount water right is "superior to and exclusive of" other claimed water rights, and rests on California water law.

For a full report on the disclaimers made by the United States and its officials of any claimed rights arising through sovereignty see United States v. Fallbrook, 1958, 165 F.Supp. 806, 812–22.

Notwithstanding such disclaimers, the United States, pressed upon the court during the trial of this action various theories of rights to water based on sovereignty (165 F.Supp. 806, supra, at page 828 et seq. and at page 832 et seq.)

and was the foundation upon which the 1940 stipulated judgment was entered. If the United States prevails as to this contention, the United States will have correlative rights to ground waters which, pursuant to the prior California litigation, they did not have.

Under these facts, if it be assumed that the 1940 judgment is a contract, the conclusion is inescapable that the United States has, by its conduct, breached that contract. If that document be a contract, Vail was privileged to assume that the United States had repudiated it and that the United States did not intend to be bound by it and that Vail could act accordingly.

The Vail Company has tendered as an exhibit, and there has been received in evidence, a document asserting the continuing breach by the United States of the supposed contract, if one exists, and in such alternative, rescinding the contract.

While it is the conclusion of this Court that the 1940 judgment is not a contract, even if it were, the inescapable result would be that the United States has, by its actions, violated the implied conditions of good faith and duty to act so that Vail would not be impaired in the receipt of its contractual benefits, Universal Sales Corp. v. California Press Mfg., 1942, 20 Cal.2d 751, 771, 128 P. 2d 666; 12 Cal.Jur.2d, Contracts, Sec. 133, pp. 345–346.

Under such circumstances, if this be a contract, Vail is clearly privileged to rescind. Cal.Civil Code, § 1689, subd. 4; Loop Building Co. v. De Coo, 97 Cal.App. 354, 364, 275 P. 881.

## VII

In Equity the United States May Not Enforce the 1940 Stipulated Judgment, Standing Alone Or as a Part of the 1930 Judgment and Findings.

We next assume for purposes of discussion, that the prior judgments are not judgments allocating riparian water and therefore are not subject to modification. May the judgment or judgments be enforced by the United States in this proceeding?

 In the present posture of this issue in the case, we have a quiet title action commenced by the United States. It is hornbook law that the United States must do equity to obtain relief. Relief granted the United States must be equitable as to the defendants.

 By an early order in the case, all parties were made adverse to each other so that cross claim pleading could be eliminated. Thus, the filing of an answer was sufficient under the order to cover the cross claim. Each defendant including Vail, must likewise do equity in seeking relief on their claimed rights. Relief granted to the defendants must be equitable among themselves and equitable to the United States.[7a]

### THE INEQUITABLE POSITION OF THE PLAINTIFF

In its amended complaint, the United States asserted rights to the use of these waters, *based on the 1940 stipulated judgment* as against the Vail Company, and in addition asserted against Vail rights of a *riparian, prescriptive* and *appropriative* nature as well as rights des-

7a. We have no doubt that these equitable issues are clearly before us because of the nature of the quiet title action and the order on cross claims. However, in addition, Vail by amended answer filed May 2, 1958, set up a Fourth affirmative defense to the effect that the 1940 judgment had created inequities. A Second Amended and Supplemental Answer was filed by Vail on November 3, 1959, and adopted those parts of the amended answer which are not inconsistent with the new pleading. In the Sixth affirmative defense set forth therein Vail alleged again the inequitable character and operation of the judgment and that the United States was asserting additional rights to those provided for in the judgment. In the same defense Vail alleged that the United States had instituted the present action and had again subjected Vail to expense in the new litigation. The Ninth affirmative defense alleged irreparable damage and the Tenth affirmative defense was an offer to do equity.

ignated as *paramount* rights. But we have held that the 1930 and 1940 judgments must be read together as one judgment.

(a) *Ground Water Bodies in 1930 Findings & Judgment*

The findings supporting the 1930 judgment expressly provided, (Findings No. 23, p. 54, line 22; Ex. Vail AB)

"It is not true that there is a common underground water plane underlying the whole or any portion of the said ancient Mesa Silt formation; but it is true that in lozenges or lenses within said ancient Mesa Silt formation occur suspended water planes as herein found; but there is no common water plane substantially or at all continuous throughout the said Mesa Silt formation."

The Mesa Silt formation is the same formation referred to in the present case as the "Older Alluvia."

The State court proceeded to find in 1930 that the only underground water planes occurred in the younger alluvial basins of Temecula and Murrieta Creeks, as they were bounded by the formation of Mesa Silt.

The Court further found (p. 55, line 11; Ex. Vail AB):

"There is no underground water plane underlying the Temecula Creek, the Murrieta Creek, the Santa Gertrudis Creek and the intervening areas between, and there is no underground water plane underlying the lands, or any of the lands, or the streams or any of the streams upon the lands,"

of defendants other than the underground water planes of the Temecula and Murrieta valleys where the younger alluvia exists.

The Court further found (p. 55, line 20; Ex.Vail AB):

"That the only underground water plane lying beneath any portion of the lands of the defendants, which underground water plane is in contact with, or which is a part of, or

which contributes to or supports, or to which there are contributions from the surface flow of said Temecula River or Creek, is the underground water plane of the Temecula alluvial basin, as herein found and described. That in addition thereto, and wholly separate and apart therefrom, and in no manner communicating therewith, is another and very much smaller water plane, lying beneath portions of the lands of the defendants and parcels of land belonging to other persons not parties of record herein, which lands are within and constitute the fill of the eroded valley of the Murrieta Creek."

These findings were not disturbed on appeal, and were not modified or affected by the stipulated judgment of 1940.

We note here that Vail owns the whole of the Temecula alluvial Basin referred to above. In the case at bar, it has been named the Pauba Valley or Basin. Vail also owns certain lands overlying the basin or water plane in the Murrieta Valley. But most important, Vail owns large areas of land in the "Mesa Silt" (as described in the 1930 findings) or "older alluvia" (as the same material has been termed in the present action).

This Mesa Silt or older alluvia on lands owned by Vail lies on either side of the Temecula younger alluvia, lies between the Temecula & Murrieta basins, on the south westerly side of the younger alluvia of Santa Gertrudis Creek and lies in places north easterly of the Murrieta Basin. There are at least 35 sections of such Mesa Silt or older alluvia owned by Vail, as shown in United States Ex. 15.

Since the State court in 1930, found that there was no underground water plane common to the areas of younger alluvia in Murrieta, Santa Gertrudis and Temecula Creek or in the intervening "mesa silt" (older alluvia) and that the only underground water planes which contributed to or supported the stream, were the water planes in the Temecula and Murrieta alluvial basins, these findings clearly meant that the waters under-

lying the "mesa silt" (older alluvia) was not part of the stream system and were what are now termed in the present action "local, vagrant, percolating waters, not part of the stream system."

Under the 1930 and 1940 judgments, the rights to this water belonged solely to Vail, (subject only to correlative rights of adjoining owners). It was not subject to use or apportionment by others as riparian water. It could not be the subject of the government's quiet title suit *to rights in the stream system.*

Thus, the 1930 findings and judgment expressly defined and limited the *ground waters* of the Temecula-Santa Margarita River to an extremely limited area. However, in this case the United States' evidence has been primarily devoted to establishing that the ground waters of the river are considerably larger than that determined by the 1930 judgment. The evidence and contentions of the United States demark an underground water unit in contact with, and part of the stream system that embraces all the area of ancient mesa silt as described in 1930 findings and here referred to as "older alluvia." The other parties' evidence is also of a similar nature. The area of this ancient "mesa silt" in the 1930 proceedings and the area of "older alluvia" in the current proceedings, as shown by maps and testimony are practically identical.

The United States thus seeks to pull into the stream system the waters of the mesa silt (older alluvia) in contravention of the 1930 findings. Hence the insistence of the United States that it relies only on the 1940 stipulated judgment.

(b) *Murrieta Surface Flow in 1930 Findings & Judgment*

The 1930 findings and judgment allocated 75 percent of the waters of the Temecula-Santa Margarita River to the Rancho and 25 percent of those waters to Vail. All of the waters of Murrieta Creek were allocated to Vail. While both the trial court and the California Supreme Court recognized that Murrieta Creek was in fact a tributary of the Santa Margarita River, it was by an express finding excluded from the term "Temecula-Santa Margarita River" as used in the findings supporting the 1930 judgment (Finding 8) and this fact was expressly recognized by the California Supreme Court (Rancho Santa Margarita v. Vail, 11 Cal.2d 501, 509–510, 81 P.2d 533).

The stipulated judgment of 1940 in Section *First* thereof lists the Rancho and Vail as having "rights in and to the waters of the Temecula-Santa Margarita River and its tributaries." The same wording is carried into Section *Second, Third, Seventh, Tenth, Twelfth.* Nowhere are the words defined or described in the 1940 stipulated judgment. We must look to the 1930 findings and judgment for their definition. There the stream system is described in detail.

As to the surface flow, the 1940 judgment makes no reference to Murrieta Creek. It did allocate a specified percentage of the Temecula-Santa Margarita River and all its tributaries to the Rancho and Vail, respectively. The 1940 judgment is silent as to what was intended to be included within the phrase "Temecula-Santa Margarita River and all its tributaries." The 1930 judgment excludes Murrieta Creek from the phrase "Temecula-Santa Margarita River" (Finding 8). However, it is conceded by all that it is in fact a tributary of the Santa Margarita River.

There is, to say the least, some ambiguity as to whether the waters of Murrieta Creek were encompassed within the 1940 judgment allocation. Vail contends that as the 1940 judgment did not define what was meant by the term "Temecula-Santa Margarita River," the meaning attributed to that term in the 1930 judgment is conclusive and Murrieta Creek is therefore excluded. With some logic Vail emphasizes that the 1930 judgment allocation of all the waters of Murrieta Creek to Vail was not appealed from by any of the parties and was in fact thereby affirmed by the California Supreme Court, and that Vail, having accomplished a limited reversal of the

1930 judgment on the principal basis of substantial error in determining its riparian acreage, would not have stipulated to a judgment which in essence was less favorable to it than the one reversed by the California Supreme Court.

Vail also points out that if the parties to the 1940 judgment had intended to include Murrieta Creek within the term "Temecula-Santa Margarita River," it would have been a simple matter, and in fact of compelling necessity, to have expressly so stated.

The United States contends, also with logic, that the phrase "and all its tributaries" enlarges upon the definition of the Temecula-Santa Margarita River as defined in the 1930 judgment and that as Murrieta Creek is a tributary, two-thirds of its waters are clearly allocated to it by the 1940 judgment.

It is not necessary to resolve these contentions for while the United States does assert in this case rights to the surface flow of Murrieta Creek, which may or may not be consistent with the 1940 judgment, they are vigorously asserting rights to ground waters of a much more substantial nature which are clearly beyond the terms of the 1930 and 1940 judgments and in fact are in direct conflict with the express findings of the 1930 litigation and, if valid, would substantially impair the benefits of Vail as provided by the California litigation.

### (c) *Vail Made a Party Defendant*

The United States claims that as to Vail, its rights and those of Vail were fixed by the stipulated judgment of 1940. The conduct of the United States has been otherwise.

After the termination of lengthy and expensive litigation by the stipulated judgment in 1940, the United States made Vail a party defendant in this action. True, the Court of Appeals for the Ninth Circuit later held that all land owners in the watershed should be made parties defendant, but even in this posture of the case, the United States could have taken the position by a letter to Vail or document filed in this proceeding, that "all our respective rights have been settled by the stipulated judgment. There is no need for Vail to defend this action as to the United States."

Instead, in the first complaint and all amendments subsequent thereto, the United States not only made Vail a party defendant, but claimed and asserted in the complaints not only rights claimed under the 1940 stipulated judgment but in addition thereto other rights such as that of downstream riparian, prescriptive and appropriative rights, and rights to the water underlying Vail's land in the "mesa silt" (older alluvia) belonging to Vail under the affirmed portion of the 1930 findings and judgment.

Under California law in the exercise of its equitable jurisdiction, a court may grant appropriate relief from judgments generally upon a showing of equitable grounds which would justify such action, Parsons v. Weis, 1904, 144 Cal. 410, 416–417, 77 P. 1007. (See cases cited in 29 Cal.Jur.2d, Judgments, Sec. 157, p. 106). In the exercise of such equitable powers the prior judgment does not constitute a bar to the equitable relief since it is solely because such judgment is valid on its face and collaterally unassailable that the equitable jurisdiction exists and is necessary, Bacon v. Bacon, 1907, 150 Cal. 477, 89 P. 317.

A proceeding for equitable relief concerning a judgment is treated as a direct, as distinguished from a collateral attack, and therefore the doctrine of res judicata does not apply, Caldwell v. Taylor, 1933, 218 Cal. 471, 475, 23 P.2d 758, 88 A.L.R. 11, 94. Further, there is no requirement that such a proceeding be tried in the court which originally rendered the judgment, Herd v. Tuohy, 1901, 133 Cal. 55, 65 P. 139, and a Federal court has jurisdiction to grant such equitable relief from State court judgments, McNeil v. McNeil, 9 Cir., 1897, 78 F. 834, affirmed 9 Cir., 170 F. 289.

While in the usual case a plaintiff would commence a separate equitable

action seeking relief from a judgment, there would appear to be no reason why a defendant could not avail himself of these equitable remedies when, as in this case, the plaintiff asserts the benefits of a prior judgment. Moreover, by order of the court in this case, all parties are adverse claimants and cross-complaints have been eliminated and, therefore, each party is in substance a plaintiff seeking to quiet title to its rights to the use of the water of the river. Certainly since the 1940 judgment, relied upon by the United States in its pleadings, affects Vail's water rights, Vail would be privileged, as it is done, to seek the equitable powers of the court and request equitable relief from that judgment.

Stated briefly, in a quiet title suit which is an equitable suit, Talbot v. Gadia, 1954, 123 Cal.App.2d 712, 267 P.2d 436, the party bringing the action must satisfy equitable claims interposed by the defendants, District Bond Co. v. Pollack, 1942, 19 Cal.2d 304, 121 P.2d 7. When an equitable defense in a quiet title suit has been interposed and proved by a defendant the court should grant such relief as is required from the facts and circumstances of the case so that justice is accomplished. See citations in 41 Cal.Jur.2d, Quieting Title, Sec. 38, pp. 509–511 and Dreher v. Rohrmoser, 1955, 134 Cal.App.2d 196, 198, 285 P.2d 285.

It is an old axiom that a party may not "have his cake and eat it too," but the United States, insisting that only the stipulated judgment of 1940 should be considered by the court, ignores the prior findings in the 1930 judgment and has offered voluminous evidence and taken up many days of court time in attempting to establish a stream system with ground water units substantially in excess of the stream system and ground water units as determined by the 1930 judgment, supplemented by the 1940 stipulated judgment.

The United States even went so far as to allege and assert *paramount rights,* and then ignoring the meaning of such words in California Water law, asserted that the government by reason of its *sovereignty,* had other rights adverse to Vail.[8] Since that time Vail has been a party to this action and has been required to appear by its attorneys in court, in 134 different court days and in many days of Master's hearings.

If the respective rights of the United States and Vail were settled by the 1940 stipulated judgment, then to say the least it is inequitable for the government to assert additional and other rights against Vail.

The plaintiff, seeking equitable relief in this quiet title action, obviously must do equity. It must come into this court with clean hands and keep its hands clean during the trial of this action.

We have then this factual situation:— a stipulated judgment entered in 1940 at a time when under the prior 1930 findings and judgment, (which we now construe to be read with the stipulated judgment),

(a) Vail had the entire use of the water of Murrieta;

(b) There existed the finding of the small ground water bodies in the younger alluvial and the finding of the absence of any ground water body, connected with the stream system, in the mesa silt (older alluvia). Large portions of the Vail property overlie the mesa silt (or older alluvial). Hence, under the 1930 findings and judgment any water found under this ground was not part of the stream system, but instead was available to Vail.

With this background, Vail agreed that the stipulated judgment might be entered apportioning the waters of the Temecula-Santa Margarita stream system between itself and the Rancho on a basis of two-thirds to the Rancho and one-third to Vail.

The United States now claims, and has proved, that there are substantial ground waters in mesa silt (older alluvial) formations and that contrary to the prior findings of fact in the California litigation, these ground waters are part of

8. See footnote 7.

the river. As a riparian the United States asserts correlative rights to these ground waters.[9]

Can the government now assert that the stipulated judgment is valid and binding and at the same time assert that as a lower riparian, it is entitled to its reasonable share of the surface and ground waters of the Murrieta and contend that it is entitled to treat the mesa silt or older alluvial as a ground water unit, and part of the stream system and particularly the water in those parts of the mesa silt (older alluvial) contained in the Vail properties?

If anything would seem inequitable, this would. The government may not assert these contradictory claims, and since it persists in its position that the larger ground water basin exists, since it has offered proof to great length on this issue, since it has forced Vail into a new law suit with additional claims adverse to Vail, since it now asserts its right as a riparian to ground waters in the Murrieta basin, it obviously cannot be considered as acting in either good faith or with clean hands.

For this Court to rule unconditionally that the United States has correlative rights to such ground waters would be grossly inequitable. The United States would in fact "have its cake and eat it too." The clear equitable solution which would accomplish justice to the United States and Vail, and all other parties to this action, is to conclude that in equity the United States may not enforce the 1940 judgment as a single document or as an integral part of the unified judgment entered in the California litigation, and that the United States as a riparian has a correlative right to the ground waters in the mesa silt (older alluvia) formations which are determined to be a part of the river.

The court so concludes, and findings and interlocutory judgment so providing will be subsequently entered. This result not only accomplishes equitable justice as between the United States and Vail, but also assures that this case will be decided not on the basis of a judgment, which from present knowledge was based on factual conclusions which were clearly erroneous, but on the evidence introduced in this case, most of which has been obtained subsequent to 1940, and is not in substantial conflict.[10]

## VIII

### Estoppel

(a) *Navy Well*

It is the contention of the United States that aside from the defense of res judicata hereinabove dis-

---

9. The United States argues that as to Vail it relies only on the 1940 stipulated judgment and that whatever its bundle of rights may be, there has been fixed by contract (the 1940 judgment) a division of the rights of Vail and the United States in the *stream system* on a basis of two-thirds (⅔) to the United States and one-third (⅓) to Vail.

But since the 1940 judgment, (even assuming the government's position), only dealt with the *stream system*, then the right to underground water in Vail's 35 sections of Mesa Silt (older alluvia), does not pertain to the stream system but belongs exclusively to Vail.

We believe but have been unable to convince government counsel that the rights flowing to the United States from our ruling, (correlative riparian rights in an immense underground water body, 35 sections of which underlie Vail land) are more valuable to the United States than rights claimed under the 1940 judgment.

10. We are not basing our decision on mistake, although this was strenuously urged by Vail. There can be no doubt that the parties and the court in the State action were actually mistaken as to the extent of the ground waters which were part of the stream. In 1930, it was not known that there existed the large ground water body which is established by the evidence in this case. This fact was not known in 1940 at the time of the entry of the stipulated judgment. It first came to light with the preparation of the Pemberton report of 1950 (Exhibit U.S.Ex. 205) in which Pemberton, a well-known and skilled geologist, outlined the existence of the ground water body in the Mesa silt (the older alluvia).

posed of, the Vail Company is estopped to assert that the 1940 judgment be set aside, enjoined or not enforced. One basis for the asserted estoppel concerns the drilling by the United States of a well on Vail lands.

The evidence shows that in 1950 employees of the United States contacted the Vail Company and requested permission to drill a well on Vail Company property. The stated reason for this request was that the United States desired to obtain geologic information. Vail Company gave its consent to the drilling of the well and the United States expended some $50,000 for this purpose. The United States drilled the well to the depth of 2469 feet and obtained the geologic information desired.

Counsel for the United States now contend that the United States drilled this well in reliance on the 1940 judgment and that Vail Company is now using the water made available by that well and that Vail would be unjustly enriched if this Court were to enjoin or set aside the 1940 judgment.

The uncontradicted evidence establishes that this well produces water of an inferior quality and limited amount and is of little benefit to the Vail Company.

However, aside from the failure of the United States to prove enrichment, this contention of the United States must be rejected for there is not one scintilla of evidence that the United States drilled this well in reliance on the 1940 judgment. The overwhelming evidence is that they drilled the well to get geologic information which they obtained.

The geologic information obtained from this well by the United States has been extensively used as evidence in this case to bolster its claim against all defendants, including Vail, to the use of the waters in the river.

It is also pertinent, that during the negotiations between Vail and the United States, when the United States was seeking Vail's consent to permit the well to be drilled, the United States did not advise Vail that they were preparing a lawsuit nor did they intimate that Vail would be served with summons and complaint.

(b) *Vail Dam*

■ The remaining basis for the estoppel contention by the United States concerns the construction of a dam by Vail Company.

In 1946, Vail Company filed an application with the predecessor of the California Water Rights Board for a permit to appropriate by storage at Vail Dam, flood waters from Temecula Creek, one of the two principal tributaries of the Santa Margarita River. The United States filed a protest with the predecessor of the California Water Rights Board against the application of Vail Company. Subsequently, the United States requested that its protest be withdrawn. Following a hearing and the taking of evidence, the application was granted and a permit was issued to Vail Company to store the flood waters. Subsequently Vail Dam was constructed and since 1948 Vail has impounded flood waters at the dam, for subsequent release and beneficial use.

Counsel for the United States contend that the United States' protest was withdrawn upon a reliance by Vail Company that any right to appropriate water at Vail Dam would be subordinate to and consistent with the 1940 judgment, and that Vail Company having been granted a permit by the California State authorities to construct its dam and having constructed its dam, cannot now seek to set aside or enjoin the 1940 judgment.

The answer to this contention is that the rights of Vail Company to the storage of waters in Vail Dam are subordinate to any right that the United States has to the use of those waters. The permit which Vail Company received from the State of California expressly states that Vail Company's rights to store water in Vail Dam are subject to all previously vested rights. Every right that the United States has to the use of these waters would fall within

this category, and as this Court will maintain continuing jurisdiction over this case, the United States will be privileged if it so desires in the future to seek relief before this Court should it ever conclude that Vail Company's storage of flood waters in Vail Dam are adverse to any United States right to the use of the waters of the river.

It is also relevant to note that Vail Company in seeking an application to appropriate by storage flood waters and subsequently constructing Vail Dam and impounding waters therein was not acting inconsistently with the 1940 judgment for that judgment expressly provides that the parties shall have the right to construct dams to impound flood waters.

In addition, even though the United States withdrew its protest it did appear at the hearing before the predecessor of the California Water Rights Board and did offer evidence concerning the application of the Vail Company to appropriate flood waters in Vail Dam. This fact is sufficient to justify the conclusion that the United States' withdrawal of its protest was, because of its own conduct, ineffectual. However, as pointed out, even if the United States had not appeared at the hearing and had effectively withdrawn its protest, there is not the slightest evidence that their rights were affected adversely, for Vail's rights to store water at Vail Dam are expressly made junior to all rights possessed by the United States.

### IX

### Effect of Refusal to Enforce 1940 Judgment

The refusal to enforce the 1940 judgment will not impair the present use of the waters of the Santa Margarita River and its tributaries by the United States. As pointed out above, the United States'

use of these waters is almost entirely from the basins of the river within the military reservation. The latest evidence [11] in this case shows that as of May 1958 those basins were full.

In addition, the basins within the United States military reservation are in large part recharged from the run-off downstream from Vail Company lands. Without now so deciding, it appears that there is a sufficient annual yield from such downstream sources, to satisfy the present uses being made by the United States on its military reservation.

The refusal to enforce the provisions of the 1940 judgment does not mean that Vail Company or any other defendant would be entitled to dry up the surface or underground flow of the Santa Margarita River. This Court will keep continuing jurisdiction of this case and should the United States believe that any upstream use reaches such an extent that its rights have been or might become endangered, the United States can immediately apply to this Court for appropriate relief.

The United States in resisting the Vail Company contention that the 1940 judgment be set aside or enjoined has expressed apprehension as to its right, as provided in that judgment, to use the waters of the river *outside the watershed*.

The 1940 judgment, in effect, provides that the United States can use its allocated waters on any of its lands including lands without the drainage area of the Santa Margarita River. In this case, the United States is the last water user on the stream. If it uses the waters of the river on its lands outside the watershed no one is, or can be, harmed. Such use would not deprive other riparians of water for there are no riparians (or for that matter any water users)

---

11. Since the decision herein and the first draft of this opinion, the United States has offered additional evidence of the effect of the dry water years of 1958, 1959, and 1960 upon the basins within the government reservations.

There has been some slight lowering of water levels but there still remains a great amount of water in the basins.

The water year of 1960 has been one of the driest in history. Its impact on the basins cannot immediately be determined.

down stream from the United States' lands. Hence the United States, under these specific factual circumstances, is privileged to use the water of the river which is available on its lands as it chooses, and can if it desires export and use that water outside the Santa Margarita River watershed, and if it does so, no one has a legal basis for objection. No water right is obtained thereby, but such use is permitted because no one is in a position to complain.

Thus, as to the water which enters the government reservation, the United States can in fact do what the 1940 judgment specifically authorized, and the apprehension of the United States as to the propriety of its use of the water outside the watershed if the 1940 judgment is not enforced or set aside or enjoined, is unfounded.

But assume the 1940 judgment was to be enforced in line with the contentions of the United States. In the event the United States attempted to limit up stream water users to permit water to flow down so it could be taken out of the watershed, every up stream water user except Vail and the intervenors could successfully resist such an attempt if the result would interfere with their reasonable use of water.

As to any claim by the United States, that two-thirds of the pooled rights to water of the United States and Vail should flow down stream for use outside the watershed, all other riparians could resist such a use as non-riparian and unreasonable. The claimed right of the United States would only be as good as Vail's original right and could not prevail over injured up stream users.

## X

### The Interlocutory Decree Will Not Be Made Appealable.

The United States has requested that the decree to be entered in regard to this issue be made appealable as provided by Rule 54(b) of the Rules of Civil Procedure, 28 U.S.C.A. This request is denied. No satisfactory reason

is apparent which would justify this Court to permit the determination of this case on a piece meal basis.

Moreover, the Court of Appeals for the Ninth Circuit in remanding this case for retrial, expressly directed that no judgment be entered " * * * until the entire suit can be disposed of at the same date," People of the State of California v. United States, 235 F.2d 647, 664. The term "judgment" would include a decree only if an appeal therefrom would lie (Rules of Civil Procedure, Rule 54(a)), and thus if this Court were to provide that the decree be appealable it would be directly contrary to the express directions of the Court of Appeals.

Findings of fact, conclusions of law and interlocutory decree will be prepared by counsel for the State of California, served and entered in accordance with this memorandum opinion.