[Civ. No. 32343.    Second Dist., Div. One.    Dec. 23, 1968.]

ALLYSON STEVENS, Plaintiff and Appellant, v. LESLIE STEVENS, Defendant and Respondent.

Young & Young and Walter H. Young for Plaintiff and Appellant.

O'Melveny & Myers, Allyn O. Kreps and Patrick Lynch for Defendant and Respondent.

LILLIE, J.—Appellant and respondent (a writer) were married February 3, 1965; 10 months later they separated and on April 19, 1966, appellant wife sued respondent for divorce; there are no children the issue of the marriage. On September 6, 1966, after extended negotiations, the parties entered into an integrated property settlement agreement. After entry of default and on November 30, 1966, appellant was granted an interlocutory decree of divorce which approved and incorporated the property settlement agreement; it was entered on December 1, 1966.

On March 27, 1967, respondent filed a petition in bankruptcy. On April 6, 1967, appellant moved to vacate the interlocutory judgment of divorce under the provisions of section 473, Code of Civil Procedure, on the stated ground that she obtained the judgment on respondent's "fraudulent, false and untrue representations" that he would perform the property settlement agreement and on her own "mistake and excusable neglect" in relying on said representations. More specifically her affidavit asserts that at the time respondent entered into the property settlement agreement it was his secret undisclosed intention not to perform or carry out its terms but to seek and obtain a discharge of his obligations by bankruptcy. All affidavits were received in evidence; after

oral argument the motion to vacate was denied. The wife appeals from order denying the motion.

Appellant contends that the trial judge abused his discretion in failing to vacate the interlocutory judgment of divorce because by filing his petition in bankruptcy respondent reduced to a nullity the property settlement agreement on which her divorce action was based; and that "regardless of any issues of fault, mistake or inadvertence" the judgment should be vacated because respondent has accepted the benefits of the judgment and relieved himself of the burdens.

Under section 473, Code of Civil Procedure, the court may upon such terms as may be just, relieve a party from a judgment "taken against him through his mistake, inadvertence, surprise or excusable neglect." "Where justice requires it, a party in whose favor a judgment has been rendered is entitled to relief from the judgment as well as the party against whom it is rendered. (*Olson* v. *Olson,* 148 Cal.App.2d 479, 482 [306 P.2d 1036].) However, '[i]t is a settled principle of law that motions for relief from default under the remedial provisions of section 473 of the Code of Civil Procedure are addressed to the sound discretion of the trial court, and the exercise of that discretion, in the absence of a clear showing of abuse, will not be interfered with by an appellate tribunal. [Citations.]' (*Rackov* v. *Rackov,* 164 Cal. App.2d 566, 569 [330 P.2d 926].)" (*Robinson* v. *Robinson,* 208 Cal.App.2d 213, 221 [25 Cal.Rptr. 143].) "All presumptions are in favor of the correctness of the order and the burden is upon the appellant to show that the court abused its discretion. [Citations.]" (*Cope* v. *Cope,* 230 Cal. App.2d 218, 231 [40 Cal.Rptr. 917].) "In reviewing an order made on affidavits involving the determination of a question of fact, this court is bound by the same rule that controls the resolution of a factual issue on oral testimony; if there is any conflict in the affidavits that favoring the prevailing party must be accepted as true, and since all intendments are in favor of the ruling of the lower court, the affidavits in behalf of the successful party are deemed not only to establish the facts directly stated therein but all facts reasonably to be inferred therefrom." (*Roberts* v. *Roberts,* 245 Cal.App.2d 637, 642 [54 Cal.Rptr. 223].)

It is apparent that in finding that the wife failed to make the necessary showing[1] for relief under section 473,

[1]In making his order denying the motion to vacate the trial judge commented: "On the showing we have here and the facts as recited I

430

Code of Civil Procedure, the trial judge resolved against her all factual conflicts presented by the affidavits. Thus she did not show to the satisfaction of the judge that at the time respondent entered into the property settlement agreement he represented to her that he would not file bankruptcy proceedings and entertained a secret, undisclosed intention to discharge his obligations in bankruptcy, and that she relied on such representation at the time she entered into the agreement and obtained the interlocutory judgment of divorce. We will not disturb the determination of the trial judge that no showing of fraud on the part of respondent, "mistake or excusable neglect" on the part of appellant or other ground upon which the judgment could be set aside, was made. (*Cope* v. *Cope*, 230 Cal.App.2d 218, 232 [40 Cal.Rptr. 917].)

The property settlement agreement itself establishes the fact of respondent's precarious financial situation and the possibility of bankruptcy and appellant's knowledge of it. At the outset the parties acknowledged their "extremely difficult" financial condition and that their debts exceeded their assets by in excess of $200,000;[2] respondent agreed to use "his best efforts to avoid bankruptcy for the parties";[3] both parties acknowledged their complete familiarity with the assets and debts of each and of the community;[4] and respondent agreed to "assume, to the best of his ability all community obligations."[5] In Paragraph IV the following was "confirmed" to appellant as her share of the community property; (a) $10,000 to be received from the sale of respondent's

can't see my way clear to usurp the contract of the parties, so the motion is denied."

[2] Paragraph III "(a) The parties acknowledge the financial condition of both parties to be extremely difficult. The parties own property, both separate and community property, but their debts, both separate and community exceed their assets, both separate and community, by an amount in excess of two hundred thousand dollars ($200,000)."

[3] Paragraph III "(b) Husband has agreed to use his best efforts to avoid bankruptcy for the parties and, in this connection, the parties have agreed to avoid the difficulty and expense, which both parties acknowledge, of setting forth a definitive list of assets and liabilities."

[4] Paragraph III "(c) Husband and wife each acknowledge, except as set forth below, a full and complete familiarity with the assets and debts of each party and of the community and in this context agree to the division of property set forth in Paragraphs IV and V below which division of property is the best effort the parties can make to divide their community property under all the circumstances. . . ."

[5] Paragraph VI "The parties hereto agree that it would be impractical, if not impossible, to set forth the community obligations of the parties. Husband agrees that husband will assume, to the best of his ability, all community obligations of the parties incurred by either or both up to and including February 28, 1966, . . ."

residence, (b) a one-half interest in certain named literary properties, (c) a 1962 automobile, (d) a quitclaim deed from respondent to certain property on Kings Road, and (e) certain furniture and personal property listed in an attached schedule. Respondent agreed to pay alimony of $1 per year (par. VIII) and to appellant's attorney, fees of $3,750 (par. XIII). (This amount was not paid and the debt was discharged in bankruptcy.)

The declarations and certificates in opposition to the motion disclose a long history of respondent's insolvency beginning at least while the parties were living together, and appellant's full knowledge thereof—the fact is, it was appellant who first consulted counsel concerning respondent's financial affairs. Nine months after the parties were married and in October 1965, appellant sought the assistance and advice of Mr. St. Johns (O'Melveny & Myers) in finding a solution to respondent's serious financial problems; they contacted Mr. Wilks, a certified public accountant, informing him that respondent had substantial difficulty in managing his business and financial affairs; thereafter both parties asked Wilks to represent respondent in an effort to settle and resolve their financial and business problems; to this end Wilks worked with St. Johns and appellant but in March of 1966 it became apparent to him that the parties had separated and become irrevocably estranged due largely to their serious financial problems; after her separation appellant retained an independent attorney, Mr. Mamakos, and between March and September 1966, he negotiated with Wilks and St. Johns toward a property settlement agreement; "time and again" the latter advised the former that there were no assets, community or separate, in excess of the obligations; on May 17, 1966, Mr. Bryant, a certified public accountant employed by appellant and new counsel, Mr. Rothschild, met with Wilks and made an independent examination and analysis of respondent's financial affairs from his books, records and accounts. On June 15, 1966, appellant and Rothschild met with Wilks, St. Johns and respondent; terms and conditions were proposed and they tried to finalize a property settlement agreement; Wilks and St. Johns summarized respondent's financial position and repeated that it was extremely precarious and the only realistic possibility of preventing immediate bankruptcy lay in the sale of respondent's residence. On July 28, 1966, appellant and Rothschild advised Wilks that the Internal Revenue Service was auditing books, papers, etc., of respond-

ent and Day Star Productions, Inc. (provisions in the property settlement agreement relate to the payment of community obligations and income tax assessments).

Respondent asserted that he and appellant separated due partly to his financial situation and although the property settlement agreement was executed September 6, 1966, the agreement reflects the basic understanding reached on June 15, 1966; at no time did he ever attempt to hide or conceal from appellant his financial condition or ability to pay his obligations but at all times made a full and complete disclosure of his financial problems; during the marriage up to and including the date of the interlocutory decree, more particularly September 6, 1966, he "never intended nor desired to entertain bankruptcy proceedings, although both [appellant] and [he] were aware of that possibility at all such times. Indeed, [his] intent, desire and efforts throughout that period were exactly to the contrary and every reasonable effort was made by [him] and on [his] behalf to avoid bankruptcy proceedings"; by latter December 1966, his earnings and property were continuously subjected to attachments and garnishments through lawsuits by creditors.

On December 22, 1966, because of respondent's increasing financial problems and without his knowledge (counsel "were concerned that confrontation with the necessity of handling the problem in the manner proposed [bankruptcy] would disturb [respondent] to the extent of interfering with his creative work") St. Johns and Wilks consulted Jack Stutman, attorney specializing in bankruptcy, for advice concerning his creditor problems including various lawsuits which had resulted in attachments and garnishments; they sought to avoid bankruptcy, had no desire to have respondent file a petition and tried to work out a plan without the necessity of bankruptcy proceedings; they held several meetings with Stutman and Mr. Treister, his partner; Stutman and Treister analyzed the situation, devoted extensive time and effort in an attempt to avoid bankruptcy for respondent and explored every possible avenue and the best possible solution before discussing the matter with respondent; during February 1967 St. Johns and Wilks had numerous meetings with Treister during which they reviewed and analyzed respondent's financial affairs and discussed the mechanics of bankruptcy; finally, Stutman and Treister advised them that the only feasible solution to respondent's ever increasing problems with his creditors was a voluntary petition in bankruptcy.

The evidence does not sustain appellant's claim of

extrinsic fraud. It reflects respondent's insolvent financial condition bordering on bankruptcy during the marriage, at the time of separation, during the extended negotiations for the property settlement agreement, at the time the agreement was signed and when appellant obtained the interlocutory judgment of divorce. It fails to establish that respondent ever represented to appellant he would not file a petition in bankruptcy, to the contrary bankruptcy appears to have been a distinct possibility and in the contemplation of both parties at all times, ultimately culminating in respondent's agreement ''to use his best efforts to avoid bankruptcy for the parties.'' Nor does it establish that respondent had a secret, undisclosed intention to discharge his obligations in bankruptcy. Whatever our personal opinion may be, the opposing affidavits support respondent's reasonable efforts to avoid bankruptcy; they demonstrate an increasingly difficult financial situation, pressing creditor problems, and continuous attachments and garnishments on his earnings and property through lawsuits brought by creditors, and his lack of intent to go into bankruptcy until six and one-half months after the execution of the agreement when he was advised by his independent financial advisors that bankruptcy was ''the only feasible solution.'' Nothing suggests that respondent concealed any assets, misrepresented the value or ownership of any property or concealed or misrepresented his financial condition or ability to pay his obligations; the record shows respondent made a full and complete disclosure of his assets and liabilities and financial problems. ██ Nor does the evidence sustain appellant's claim of ''mistake and excusable neglect.'' Fully aware of respondent's financial condition, his assets and liabilities, and that bankruptcy was a real possibility, and represented by counsel of her own choice who independently analyzed respondent's financial and business affairs and reviewed and approved the property settlement agreement, appellant entered into the same and obtained a default divorce—there is no suggestion that appellant did not receive a full, fair and complete hearing at that time. In the light of the showing made to the court below, appellant has failed to demonstrate an abuse of the trial judge's discretion in denying her relief under section 473, Code of Civil Procedure.

In arguing the ''equities'' appellant complains that ''with great earnings [respondent], ran up great debts and then washed them out in bankruptcy leaving [her] to pay her attorney's fees, the community debts, . . . and stripping her

of the community assets." The truth is that the parties lived together 10 months; there are no children the issue of the marriage; there were no "community assets" in excess of their debts; and the "great debts" respondent "ran up" were accumulated before and during marriage for at the time they entered into the property settlement agreement they acknowledged that their debts, both separate and community, exceeded their assets, both separate and community, by in excess of $200,000. Except for the $3,750 respondent agreed to pay her counsel for attorney's fees, appellant has received substantially all she contracted for. The property settlement agreement "confirmed" to appellant as her share of the community property (par. IV), and she thereafter received, all protected from respondent's creditors: $10,000 cash (from the sale of respondent's residence), a 1962 automobile (in her possession), a one-half interest in specified literary properties (they were listed by respondent as an asset in the bankruptcy schedules but each is subject to appellant's continuing one-half interest therein created by the property settlement agreement), a quitclaim deed to real property on Kings Road (this appears to have been appellant's separate property and the marital residence; on November 22, 1966, respondent quitclaimed his interest therein to her but subject to her obtaining a stipulation for dismissal with prejudice from Fischer in Stevens v. Fischer, No. 881,348; respondent claims that on February 24, 1967, he removed all restrictions for delivery of the deed, the same has been delivered and appellant is free to record the same; appellant does not claim that the obligation to convey the quitclaim deed was discharged in respondent's bankruptcy) and certain listed furniture and personal property. As to respondent's "great earnings," projections on which respondent's financial advisors in March 1967 based their decision that bankruptcy was the only reasonable solution, indicate "that if he continued his present earnings rate of approximately $125,000 per year and restricted his living expenses to approximately $25,000 per year, then the distribution of net moneys after tax and business expenses would nevertheless take approximately 8 to 10 years in satisfaction of then existing creditors' obligations."

In her reply brief appellant suggests that respondent misconceives her position by stating that she argued that consent judgments may be vacated on different grounds than other judgments. In the light of the statement in her opening brief that she "feels that . . . regardless of any issues of fault,

mistake or inadvertence [she] should be entitled to have this default judgment set aside on the basis that [respondent] has accepted the benefits of the judgment and has relieved himself of its burdens,'' we are inclined to agree with respondent. Appellant really argues that since ''divorce actions and judgments differ from ordinary judgments'' because the defendant usually obtains relief coextensive with that obtained by plaintiff, and this is a ''mutual judgment'' which must be treated as a contract (*Yarus* v. *Yarus*, 178 Cal.App.2d 190 [3 Cal.Rptr. 50]; *In re Ferrigno*, 22 Cal.App.2d 472 [71 P.2d 329]), thus if one fails to perform his part of the agreement the other is entitled to have the judgment vacated (*Harth* v. *Ten Eyck*, 16 Cal.2d 829 [108 P.2d 675]; *Hecq* v. *Conner*, 203 Cal. 504 [265 P. 180] [holding that where a condition of agreement for dismissal of an action is breached it was proper to vacate the judgment]), even though she has failed to make a proper showing for relief under section 473, Code of Civil Procedure, the interlocutory judgment of divorce must be set aside because of respondent's asserted breach of the property settlement agreement which was approved and incorporated therein. We are not prepared to say that respondent's voluntary petition in bankruptcy filed on his own behalf under the circumstances of this case constitutes a breach of his agreement ''to use his best efforts to avoid bankruptcy *for the parties.*'' (Italics added.) Of course the grounds available under section 473 for relief from a judgment taken against a party through his mistake, inadvertence, surprise or excusable neglect, or extrinsic fraud, are applicable to consent judgments and we have here sustained the trial judge's denial of relief to appellant under said section.

However, if, as urged by appellant, we are to apply the rules applicable to rescission of contracts to this judgment for respondent's asserted breach of the agreement approved and incorporated therein, we would be according to those seeking relief from judgments of this kind a ground for setting them aside that does not exist for other judgments. ■ While a consent judgment for the purpose of interpretation and construction is regarded as a contract between the parties and must be interpreted and construed as any other contract, ''as to the matters in issue [it] is as conclusive as one entered upon contest and trial. (*Moore* v. *Schneider*, 196 Cal. 380 [238 P. 81]; *Yarus* v. *Yarus*, 178 Cal.App.2d 190 [3 Cal.Rptr. 50].)'' (*Wheeler* v. *Trefftzs*, 228 Cal.App.2d 271, 274 [39 Cal.Rptr. 507]); and for the purpose of a motion to vacate a

consent judgment is no different than any other. *Yarus* v. *Yarus,* 178 Cal.App.2d 190 [3 Cal.Rptr. 50], and *In re Ferrigno,* 22 Cal.App.2d 472 [71 P.2d 329], are of little comfort to appellant for they do not hold that consent judgments are contracts for purposes other than interpretation of ambiguities. (*United States* v. *Fallbrook Public Utility Dist.* (S.D. Cal. 1961) 193 F.Supp. 342.) Said the United States District Court in *Fallbrook* relative to *Yarus* and *Ferrigno,* "When a court determines that a judgment is to be treated as if it were a contract between two or more parties, it does so by analogy. It is not necessarily intended that there is in literal effect a contract, . . ." (P. 356.)

Our attention has been directed to 49 Corpus Juris Secundum, Judgments, section 178, at pages 315-316 (1947), 3 Freeman on Judgments, No. 1350, pages 2773-2774 (5th Ed., Tuttle Revn. 1925), and Court's Power Over Consent Judgments, 139 A.L.R. 421, 422 (1941), the consensus of which is that while a consent judgment is contractual in its nature and should be construed as though it were a contract, it cannot be vacated merely because of a subsequent failure to perform a condition on which the consent was based, and unless it is vacated or set aside in the manner provided by law it stands as a final disposition of the rights of the parties thereto.

The order is affirmed.

Wood, P. J., and Fourt, J., concurred.